# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| ANNA HARRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 6:21-CV-39 |
| JUSTIN MARR, Sheriff of Victoria ) | JURY TRIAL DEMANDED AS TO |
| County, Texas, in his official and ) | COUNT FOUR |
| individual capacities; CONSTANCE ) | |
| FILLEY JOHNSON, District Attorney ) | |
| for Victoria County, Texas, in her ) | |
| official capacity; JOHN DOE, a ) | |
| currently unidentified deputy at the ) | |
| Victoria County Sheriff's Office, in his ) | |
| individual capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

# FIRST AMENDED COMPLAINT

1. On July 27, 2021, Plaintiff Anna Harris was served with a document labeled "Victoria County Sheriff's Office Criminal Trespass Warning [CTW]." This document states that Harris is indefinitely banned from, among other places, the Victoria County Courthouse and the Victoria County Jail, and it provides that attempts to go to these places will result in "an on-scene arrest" by an agent of Defendant Victoria County Sheriff Justin Marr and "an offense report being generated in the [office of Defendant] District Attorney [Constance Filley Johnson] for criminal prosecution." This document states under "reason for CTW" that Harris is banned from the courthouse and the jail for "making an inappropriate video."

2. Because the CTW constitutes a flagrantly unconstitutional denial of Harris's First Amendment right to access criminal trials, because the CTW issued in retaliation for protected speech in a public forum, and because the CTW issued without any process for Harris to challenge it, Harris brought this Action on July 29, 2021, at approximately 2:30 PM central time, to enjoin the Sheriff and his deputies from arresting her, and the District Attorney from prosecuting her, for entering the courthouse or jail as any other citizen may freely do. Harris's complaint was accompanied by a request for an emergency temporary restraining order.

3. Approximately an hour and fifteen minutes later, counsel for Defendants wrote, by email, that Defendants would not arrest or prosecute Harris "based upon failure to comply with the Criminal Trespass Warning."

4.      Three hours and 45 minutes after that email, Victoria County Sheriff's deputies pulled Harris over as she was driving to meet a friend at a local Starbucks, immediately asked her to step out of the vehicle, handcuffed her, put her in a squad car, drove her to the jail, and charged her with changing lanes without a signal and littering. Because this arrest was effected without any probable cause, because regardless the arrest was made on suspicion of the type of charges for which officers almost never arrest people, and because overwhelming circumstantial evidence suggests that it was directed by the Sheriff and motivated by the filing of this lawsuit, Harris files this Amended Complaint to seek damages for the harm the Sheriff's illegal arrest caused her. And because this arrest is part of an ongoing pattern of attempting to deter Harris from exercising her rights, Harris files this Amended Complaint to seek an injunction against using further pretextual arrests against her.

## **Parties**

5.      Plaintiff Anna Harris[1] is an activist who works to reform the Texas criminal legal system. As part of this work, Harris founded an organization called JUST-US Participatory Defense. JUST-US, alongside a partner organization, the Texas Jail Project, helps people going through the criminal legal system in many Texas counties understand the process and access their legal rights. Among other things, Harris helps jailed people in Victoria County communicate with their

---

[1] Plaintiff's full name is Anna Barnett Harris. Her name is erroneously listed on the CTW as "Anna Harris Barrett-Tate."

attorneys and family members, and she helps appointed criminal-defense attorneys in Victoria County communicate with their clients, gather evidence, and contest criminal charges.

6.    Defendant Justin Marr is the Sheriff of Victoria County, Texas. His office issued the CTW barring Harris from the courthouse and jail, and his deputies would arrest Harris pursuant to the CTW if she enters the courthouse or jail. His deputies, at his direction, arrested Harris in retaliation for the filing of this lawsuit, and his office is presently planning to arrest Harris to frustrate her attempts to attend criminal trials. The Sheriff is sued in his official and individual capacities for damages and injunctive relief.

7.    Defendant John Doe is an unidentified Sheriff's Deputy in the Victoria County Sheriff's Office. He is sued in his individual and official capacities for damages and injunctive relief.

8.    Defendant Constance Filley Johnson is the District Attorney for Victoria County, Texas. The CTW threatens that if Harris enters the courthouse or jail, the District Attorney's office would generate an offense report and prosecute Harris for criminal trespass. If the Sheriff's office arrests Harris on pretextual charges, the District Attorney would be responsible for prosecuting her. The District Attorney is sued in her official capacity for injunctive relief only.

**Jurisdiction and Venue**

9.    Harris brings this Action under 42 U.S.C. § 1983 alleging violations of her rights under the First Amendment to the United States Constitution. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, and

3

venue is proper in this District and Division because all of the events complained of occurred in this District and Division.

### Harris Attends Trials and a Local Judge is Upset

10.    Pursuant to her role at JUST-US, Harris regularly attends criminal trials in Victoria County. Harris is a licensed paralegal, and so sometimes she assists the defense team and sits at counsel's table. Sometimes she assists in a less formal role, sitting in the gallery and communicating with the defendants' family and supportive friends.

11.    In July of 2021, Harris attended the trial of Kervin Bryant in the 377th Judicial District Court in Victoria County. Judge Eli Garza presided.

12.    Harris was assisting defense counsel with paralegal and mitigation support.

13.    Throughout the trial, Judge Garza gave Harris a hard time.

14.    Judge Garza admonished Harris during *voir dire* when a prospective juror tried to talk to her even though Harris not only declined to respond to the prospective juror but actively shielded her face from the person who was trying to speak with her.

15.    During a recess in the trial, when Harris was connecting a computer to a projector in the courtroom at the direction of defense counsel, Judge Garza entered the courtroom, asked Harris whether she was a lawyer, and when she replied that she is not ordered Harris to leave the well because she was not allowed to be there. The projector was never set up, and as a result was not used by the defense in the trial.

16.     During a different recess in the same trial, Harris was in the courtroom sending text messages to a potential defense witness at the direction of defense counsel. Judge Garza entered the courtroom and instructed her to put her phone away. He then ordered Harris to come up to the witness stand and asked her, on the record, why she was in court and what she was doing. Harris replied that she was a mitigation expert and paralegal for the defense team. Garza said that the bailiffs had gotten complaints that Harris was "making faces" in the courtroom. Harris asked if she could reply, and Judge Garza said no. Judge Garza instructed Harris to sit away from the jury, which she did.

17.     If she had been given the opportunity to reply, Harris would have told Judge Garza that at that time she had only about 42% of her hearing and sometimes strained to hear things in court, so she tried to position herself in the courtroom so that she could read lips. Harris would also have told Judge Garza that she has severe Attention Deficit Hyperactivity Disorder (ADHD), which manifests itself in part in physical "tics" when she is trying to pay attention, such as sucking down on her tongue (which makes it look like she is smiling). Harris would have explained that when she does not do that, her body responds to her condition in other ways like visibly swaying because she is distracted.

18.     After this admonishment by the judge, Harris made every effort to avoid sucking her tongue or making any facial expressions at all. Harris tried chewing gum and biting her lip, which caused her to developed a sore on her lip.

19.     During closing arguments of that trial, a bailiff removed Harris from the courtroom. Outside of court, Harris protested with the bailiff that she was part of the defense team and further that she wanted to observe court. The bailiff offered to let her get her things from the courtroom, but did not permit her to return to observe the rest of the trial. Harris chose to wait outside of the courtroom until closing arguments were over to get her things because she did not want to interrupt the closing arguments by entering the courtroom and leaving again.

### Harris Posts a Video on Tik-Tok

20.     Because the coronavirus pandemic made in-person jail visits potentially hazardous, two former courtrooms on the third floor of the Victoria County Courthouse have recently been used for video conversations with people currently incarcerated in Victoria County.

21.     In-person visits began to gradually resume in the last few months, and so one of the two former courtrooms on the third floor is no longer used for jail visits. It is instead used by people in the courthouse to rest, make phone calls, or wait for other court proceedings.

22.     This room is open to any member of the public without ostensible restriction. There are no signs in this room indicating that any part of it is off limits to the public or open to only certain uses.

23.     In late July 2021, Harris was in the Victoria County Courthouse pursuant to her role as an advocate.

24.     She had some downtime, and so she was relaxing in the open room on the third floor. To pass the time, Harris used her cellphone to shoot a video to be

posted on Tik-Tok, a social-media site that allows users to post short, often humorous, videos.

25.     In the video, Harris stands on an unmarked wooden dais and dances. *Bills Bills Bills*, by Destiny's Child (a pop music group), plays in the background, and a caption reads "When you pick a jury on a Monday before lunch……" Harris intended this video to serve as a challenge video, a genre of Tik-Tok posts in which many users dance in many different places to the same song.

26.     The video is a harmless joke, made in an otherwise empty room open without restriction to the public. Harris disturbed no one when she made it, and its content is thoroughly benign, let alone so objectionable or dangerous as to be without First Amendment protection.

### Harris Is Served With a CTW Indefinitely Barring Her From Many Public Buildings, Including the Courthouse, Explicitly Because of the Video

27.     At 9:30pm on July 27, 2021, a Victoria County Sheriff's Deputy served Harris at her home with a CTW. That document is attached to this Complaint as Exhibit A.

28.     The CTW lists Judge Eli Garza as the complainant. Judge Garza signed the CTW and dated it July 23, 2021. Judge Garza is a Judge of the 377th District Court, Victoria County, Texas.

29.     Under "Location and Reason for CTW:" the following is handwritten: "Anna Harris Barrett-Tate has been issued a CTW for the following location: Victoria County Courthouse, 115 N Bridge[;] Victoria County Annex, 205 N

Bridge[;] and VCSO [Victoria County Sheriff's Office], 101 N Glass. The CTW was issued due to Anna Harris Barrett-Tate making an inappropriate video on the judge's bench, which occurred in a courtroom located on the third floor of the 1892 Courthouse."

30.     The CTW purports to issue under "Texas Penal Code Section 30.05 (Criminal Trespass) at the complainant's request."

31.     The CTW's pre-printed text reads that "It is valid for a period of one (1) year from the date of issuance," but the phrase "for a period of one (1) year" is crossed out and the word "indefinitely" is handwritten in its place.

32.     The CTW reads "Future occurrences of trespassing will result in an on scene arrest of the offender and an offense report being generated in the District Attorney's Office for criminal prosecution, which carries a maximum penalty of 180 days in county jail and/or a fine not to exceed $2,000."

33.     The CTW is signed above the signature line "Issuing VCSO Deputy." The signature is illegible. It is dated July 27, 2021.

### Harris Files Suit and Defendants Claim That They Will Not Enforce the CTW

34.     On July 28, 2021, Charles Gerstein and Jason Harrow, counsel for Harris in this Action, spoke by phone with Tammy Deyton, an attorney at the District Attorney's office, and explained that they would be seeking emergency relief to secure Plaintiff's rights before a trial scheduled to begin in a few days.

35.     During this phone call, Deyton did not indicate that she knew who Harris was or that a CTW had issued against her.

36.    Plaintiff's counsel spoke by phone moments later with a representative of the Sheriff's office, who suggested that counsel leave a voicemail message for the Sheriff's secretary, which counsel did.

37.    About forty-five minutes later, Deyton, the lawyer in the District Attorney's Office, called Harrow. Deyton said that the return call was to apprise Harrow of (to paraphrase) who Harrow's client was. During the brief conversation, Deyton asked Harrow if he'd seen the relevant video, asked if he thought it was appropriate, and suggested that Deyton thought it was obviously not. She mentioned she was aware of several unrelated (and false) allegations against Harris, and asked whether Harrow was aware of these allegations. Deyton also asked Harrow if he and Harris were family friends, because (again paraphrasing) Deyton wondered why Harrow was representing such a person without a pre-existing relationship. Harrow and Deyton then ended the call.

38.    Later that day, Plaintiff's counsel sent a letter to Deyton explaining Harris's claims and anticipated application for relief.

39.    In the morning on July 29, Plaintiff's counsel again called the Sheriff's office, and was this time directed to contact the office of the County Judge. A representative in that office explained that Kevin Cullen will be representing the Sheriff in this matter. Plaintiff's counsel forwarded the notice letter to Cullen immediately.

40.     On July 29, 2021, at 2:39 PM central time, Harris filed a Complaint in this Action. At 2:47 PM central time, Harris filed Application for a Temporary Restraining Order.

41.     Plaintiff's counsel emailed copies of the filed papers to Cullen and Deyton at 2:54 PM Central Time.

42.     At 3:42 PM Central Time, Cullen wrote back, explaining that he represents both the Sheriff and District Attorney, and explaining: "As you requested in prior communications, the Sheriff's Office and its deputies will not arrest your client based upon failure to comply with the Criminal Trespass Warning.  Likewise, the District Attorney's Office will not prosecute your client for failure to comply with the Criminal Trespass Warning. Please advise the Court of this communication and that there is no necessity for a TRO."

43.     Gerstein and Harrow called Cullen moments later. They asked whether Defendants intended permanently not to enforce the CTW, and Cullen said that they intended permanently not to enforce the CTW.

44.     Gerstein and Harrow asked if Defendants would be willing to enter into a consent decree forbidding such enforcement, and Cullen said no.

45.     Gerstein and Harrow told Cullen that they would alert the court that a TRO was no longer necessary, but that they would likely not withdraw their request for injunctive relief.

46.     At 4:12 PM Central Time, Gerstein sent an email to this Court's case manager, CC'ing Plaintiff's other counsel and Cullen, copying the text of Cullen's

earlier email and adding "[W]e are no longer seeking emergency relief before Monday, and we thank the Court for its prompt attention to this matter. We are not at the moment withdrawing our request for injunctive relief (and do not waive our right to seek any appropriate relief in the future), but no longer need the court's immediate attention."

### That Night, In Retaliation for Filing this Action, Sheriff's Deputies Arrest Harris on Trumped-Up Charges

47.     Around 7:30 PM on July 29, 2021, Harris was driving from her home in downtown Victoria to meet a friend for coffee at a local Starbucks.

48.     Harris recently purchased a new, 2021 Toyota Corolla, and she was driving this car that evening.

49.     Harris's car is equipped with a lane-departure-mitigation system, which was activated on July 29, 2021. If the car leaves a lane (as detected by on-board sensors) without a turn signal indicating motion in the same direction, the system alerts the driver of the vehicle with a dashboard notification, audible warning, and attempts to automatically correct the steering wheel to stay in the original lane.

50.     Throughout her drive on July 29, 2021, the lane-departure-mitigation system did not alert Harris that she was changing lanes without a signal.

51.     Throughout her drive on July 29, 2021, Harris did not throw anything out of the car and the windows of her car were up.

52.     As she was driving, Harris noticed that a black SUV had been following her for around five minutes.

53.     As she approached the Starbucks, the black SUV flashed blue lights, indicating that Harris should pull over, which she did.

54.     A white man in black clothes and wearing a black bullet-proof vest (an outfit that Harris recognized to be military-style tactical police gear) emerged from the SUV and approached the driver's side of Harris's car.

55.     Harris rolled down the window.

56.     Harris saw that the man had on a badge from the Victoria County Sheriff's office and that he was a Sheriff's deputy.

57.     The deputy asked Harris for her driver's license and proof of liability insurance.

58.     Harris handed him her driver's license. She explained that her proof of liability insurance was in digital form on her iPhone, and she began to open her phone to show the proof to the deputy.

59.     As Harris was looking at her phone, the deputy abruptly snatched it out of her hand through the open window and demanded that Harris get out of the car, which she immediately did.

60.     The deputy told Harris to face the car and put her hands behind her back, which she did.

61.     The deputy handcuffed Harris's hands behind her back.

62.     Harris asked, politely, why she was being arrested.

63.     The deputy responded that she was being arrested for changing lanes without a turn signal and for littering.

64. The deputy explained that he would search Harris's car as a "inventory search." Harris told him to go ahead, and the deputy—along with several other deputies who arrived as Harris was being arrested—began to search her car.

65. Harris asked the deputy what would happen to her car. He explained that it would be impounded. Harris asked if instead a friend could come pick it up, and the deputy said no.

66. As the deputies were finishing their search of Harris's car, they escorted her to a patrol car (marked with the Sheriff's insignia) and lowered her into the backseat.

67. Deputies secured Harris with a tight-fitting seatbelt, with her hands still handcuffed behind her back. Harris was unable to move her hands or lean forward.

68. Harris asked the deputy who pulled her over to bring back her phone, which he had taken from her, which he did and gave to the deputies escorting Harris to the jail.

69. Two deputies drove Harris to the Victoria County Jail, which is operated by the Victoria County Sheriff's Office.

70. When they arrived, the patrol car pulled into the sallyport of the jail. The driver turned off the engine, stepped out of the car, and closed the door, leaving Harris shackled and immobilized in the backseat.

71. With the engine off and the windows closed, the patrol car in which Harris was shackled began to get very hot.

72.     Harris could not move enough to get anyone's attention.

73.     She worried that she would be left in the car, and began to feel intense panic, fearing for her safety and even her life.

74.     About fifteen minutes later, the deputy who originally pulled her over opened the back door of the patrol car and spoke with Harris.

75.     The deputy appeared to Harris to be acting in an unusually friendly manner, and the two ended up in an unusually deep conversation about grief, depression, and their families.

76.     One of the deputies who transported Harris to the jail returned to the car, released the seatbelt, and turned Harris over to a female jailer, who conducted an intake questionnaire and did an initial pat down search.

77.     Then the jailer and the deputy who initially pulled over Harris walked her into the jail, released her handcuffs, instructed her to remove her jewelry, and conducted an additional search through a body scan machine.

78.     The deputy and jailer then escorted Harris to the holding pen of the jail, where they locked her inside with other arrestees.

79.     Because she was pulled over on her way to meet her friend, Harris had not yet eaten, and she was very thirsty.

80.     Harris asked a guard for food and water, and the guard said no.

81.     Harris sat quietly, hungry and thirsty, and terrified that Sheriff's deputies—who, wearing tactical gear, had just pulled her over, arrested her on

suspicion on false charges that almost never to result in arrest, and locked her immobilized in the backseat of a car with the windows up—would harm her further.

82.     At around midnight that night, Harris was brought to a counter at the jail, where a woman told her that she would be released shortly.

83.     Harris was handed a notice to appear at a hearing a few days later and released.

84.     She was not required to pay any money to secure bail or otherwise.

85.     As Sheriff's deputies were returning her cellphone, Harris asked how she was supposed to get home. It was approximately 1:00 AM, and Harris's car had been impounded.

86.     A deputy told her that she needed to call a friend to pick her up. Harris then attempted to call her friends, but they were all evidently asleep. Harris asked the deputy if someone from the Sheriff's office could drive her home, and the deputy said no.

87.     So Harris walked home from the jail, in the middle of the night, through downtown Victoria, which was nearly devoid of people or cars.

88.     As a matter of ordinary law-enforcement practice, the Sheriff's office does not ordinarily make routine traffic stops within the City of Victoria.

89.     As a matter of ordinary law-enforcement practice, Sheriff's deputies and other police agents in Victoria County do not perform custodial arrests of people for failing to signal lane changes and littering.

**The Sheriff's Agent Discusses Harris's Arrest and the Sheriff's Future
Plans**

90.     On July 30, 2021, at approximately 11:55 AM, Plaintiff's counsel called
Cullen, counsel for Defendants in this case.

91.     Gerstein told Cullen that Harris had been arrested the previous night
under extremely suspicious circumstances—the same day that she sued the Sheriff
and sought a TRO, on baseless suspicion of charges that almost never result in
arrest—and asked Cullen if he had any information about this.

92.     Cullen said that "the sheriff's office will be dropping those charges."

93.     Cullen said that he did not know what the specific charges were, but
that "whatever they are they're being dropped."

94.     Gerstein asked if Cullen had spoken to the Sheriff's office above the
charges, to which Cullen responded "that's attorney–client privilege."

95.     After a lengthy pause, Cullen said "well, aren't you going to say thank
you?"

96.     After Gerstein did not respond by thanking him, Cullen asked if
Plaintiff's counsel wanted the charges to be reinstated.

97.     Gerstein said no.

98.     Cullen said "then tell me thank you for getting the charges dropped."

99.     Gerstein said "well, did you get the charges dropped?"

100.    Cullen responded "I don't know who else would have."

101.    Gerstein asked how Cullen was notified of Harris's arrest, and Cullen
invoked attorney–client privilege and declined to respond.

102.   After counsel discussed another matter, Cullen reiterated that he hasn't seen any of the facts and knows nothing about the circumstances of the arrest, but that he "told them to dismiss the case."

103.   Cullen then said that he had some questions for Gerstein. Cullen asked what Harris's role would be in next week's trial. He said that he "need[s] to know to be able to advise the sheriff's deputies about what they can remove her for."

104.   Cullen then explained that if Mr. Harris was going to be there in her role as a certified paralegal, there are things she would be allowed to do, such as "cross the bar," "sit at counsel's table," and "talk to witnesses," but that if she was there as only a member of the public she could not do those things.

105.   Gerstein asked Cullen if Harris would be arrested if she deviates from the role that she had in the trial, and Cullen said that he was trying to determine her role because if she appears in a role as a paralegal, she is allowed to do certain things, such cross the bar in the courtroom and sit at counsel's table.

106.   After counsel discussed another matter, Cullen again asked Gerstein what Harris's role in the upcoming trial would be.

107.   Gerstein said that although he believes Harris's anticipated participation in the trial to be clear from her declaration and TRO papers, he would discuss the matter with Harris and respond by email. Cullen said that an email would be even better than a verbal response.

108.   Gerstein responded by asking: "wouldn't it be up to the judge whether the sheriff's deputy removes her from the court?"

109.  Cullen replied "they have to listen to the judge but they also have to listen to me."

110.  Gerstein responded that he was concerned about why the Sheriff needs to know specifics of Harris's anticipated conduct unless the Sheriff was planning on arresting Harris in court if she attends the trial and behaves in a manner that the Sheriff—but not the judge—deems inappropriate.

111.  Cullen said that he "need[s] to know which hat [Harris] plans on wearing in the trial." Cullen advised that "I know you don't have to tell me, but I'm worried you are trying to generate a conflict."

112.  Gerstein and Harrow vigorously denied this conclusion and noted that they had called only because agents of one of the Defendants had arrested their client. Gerstein and Harrow noted that they did not want to create a conflict, but that they were extremely concerned that Cullen was asking questions suggesting that the Sheriff would be policing appropriate courtroom decorum on pain of arrest and removal from the courtroom.

113.  Counsel ended the phone call shortly thereafter.

114.  The same day, Cullen emailed Gerstein a copy of a letter, signed by Defendant Justin Marr, reading "Dear Ms. Harris, I am writing you in regards to VCSO Case # S21-02340. You were charged with two counts of Failure to Signal Lane Change (TTC 545.104) and one count of Littering 5lbs or less (HSC 365.012 Class C). You were notified to appear in court on August 4th, 2021 on these charges. However, you no longer need to appear in court as these charges have been dropped.

18

These charges have not and will not be filed with the Justice of the Peace. Furthermore, these charges will not reflect in the Victoria County Sheriff's Office records management system."

115.   The same day, Cullen emailed Gerstein: "Please be advised that Eli Garza withdrew/cancelled the Criminal Trespass Warning shortly after 4 pm yesterday. As a result, the CTW was no longer valid at that time."

116.   Harris, fearing for her safety, left Victoria on July 30, 2021.

## **The Harm to Harris**

117.   Harris's work depends on her ability to access public court proceedings in Victoria County.

118.   Specifically, Harris planned to serve as a mitigation specialist in a murder trial (*State v. Varela*, No. 19-04-31425-D) that, at the time of her arrest, was scheduled to commence on August 2, 2021, in the 377th Judicial District Court in Victoria County, Texas.[2]

119.   Because of the CTW, Harris feared that she could not attend that trial without fear of immediate arrest and prosecution.

120.   Worse, based on her July 29th arrest in response to this lawsuit, and based on the Sheriff's representative's persistent inquiries into her planned etiquette at the trial—which Harris believes to be none of the Sheriff's appropriate

---

[2] That trial has been rescheduled to November 10, 2021.

concern— Harris fears that if she attends the trial (or any other court proceeding in Victoria County) she will be arrested on further trumped-up charges.

121.    Harris was pulled from her car, handcuffed, and jailed.

122.    Harris was abandoned in the back of a patrol car, hands cuffed behind her back and fastened in tightly, with the windows up and no sign that anyone was coming to help her. She experienced intense panic and fear, and even feared for her life.

123.    Harris was held without food and water for several hours in a holding pen.

124.    Harris was released in the middle of the night without a car or anyone to take her home.

125.    Harris continues to fear for her safety.

## Claims for Relief

*Count One*: **Denial of Access to Public Trial in Violation of the First Amendment Under 42 U.S.C. § 1983 and the United States Constitution (Against Marr and Johnson for Injunctive Relief and Nominal Damages Only)**

126.    Harris incorporates all prior and subsequent paragraphs here.

127.    Harris wants to attend criminal trials in Victoria County, Texas.

128.    The First Amendment indisputably protects the right of a member of the public to attend a criminal trial absent a compelling government reason to bar that person's access and a narrowly tailored order.

129.   The CTW's only stated reason for barring Harris *indefinitely* from the entire courthouse was that she posted a video that the CTW (without any support) characterizes as "inappropriate."

130.   The CTW is, therefore, a violation of Harris's right to access public trials.

131.   The CTW may be reinstated at any moment after August 26th without notice to Harris, let alone an opportunity to be heard.

132.   Harris, therefore, cannot attend criminal trials in Victoria County without fear that she will be arbitrarily arrested.

### *Count Two*: Retaliation in Violation of the First Amendment Under 42 U.S.C. § 1983 and the United States Constitution (Against Marr and Johnson for Injunctive Relief and Nominal Damages Only)

133.   Harris incorporates all prior and subsequent paragraphs here.

134.   Harris posted a video on Tik-Tok that she made in a totally open public forum.

135.   That video consists exclusively of constitutionally protected speech and contains nothing that even approaches unprotected speech under the categorial approach established by the United States Supreme Court.

136.   The CTW permanently banned Harris from many public buildings, which would chill a person of ordinary firmness from engaging in constitutionally protected activity.

137.   The CTW issued in explicit response to Harris's constitutionally protected speech.

138.    The CTW, therefore, constitutes retaliation in violation of the First Amendment to the United States Constitution.

139.    The CTW may be reinstated at any moment after August 26th without notice to Harris, let alone an opportunity to be heard.

140.    Harris, therefore, cannot attend criminal trials in Victoria County without fear that she will be arbitrarily arrested.

141.    Harris fears further retaliatory bans from public spaces if she engages in other forms of public speech that any citizen might find "inappropriate."

### *Count Three*: Violation of the Due Process Clause Under 42 U.S.C. § 1983 and the United States Constitution (Against Marr and Johnson for Injunctive Relief and Nominal Damages Only)

142.    Harris incorporates all prior and subsequent paragraphs here.

143.    The CTW indefinitely deprived Harris of her constitutionally protected right to go where any member of the public may go.

144.    The CTW issued without any notice to Harris, without any opportunity to be heard, and without any reasoned decision by a neutral government official. In fact, it issued without any process whatsoever.

145.    The CTW, therefore, violates the Due Process Clause of the United States Constitution.

146.    The CTW may be reinstated at any moment after August 26th without notice to Harris, let alone an opportunity to be heard.

147.    Harris, therefore, cannot attend criminal trials in Victoria County without fear that she will be arbitrarily arrested.

***Count Four*: Retaliation in Violation of the First Amendment Under 42 U.S.C. § 1983 and the United States Constitution (For Damages Against Marr Only)**

148.   Harris incorporates all prior and subsequent paragraphs here.

149.   Harris filed a Complaint and application for a TRO in this Court.

150.   The same day, the Sheriff or a high-ranking official with his designated authority directed his deputies to arrest Harris in retaliation for filing this Action.

151.   Harris's arrest was effected without probable cause to believe that she committed any crime.

152.   Regardless, Harris's arrest was effected under circumstances where law-enforcement officials typically exercise their discretion not to arrest.

153.   Harris's arrest was directed by the Sheriff or a high-ranking official with his designated authority, and it therefore constitutes an arrest pursuant to an official policy of retaliation against Harris.

154.   Harris's arrest, therefore, constitutes retaliation in violation of the First Amendment.

***County Five*: Arrest Without Probable Cause in Violation of the Fourth Amendment Under 42 U.S.C. § 1983 and the United States Constitution (For Damages Against Marr or, in the Alternative, an Unknown Deputy John Doe)**

155.   Harris incorporates all prior and subsequent paragraphs here.

156.   Sheriff's Deputies pulled over Harris's car without reasonable suspicion to believe that she had committed any crime under Texas law, and they

arrested her without probable cause to believe that she had committed any crime under Texas law.

157.   Harris's arrest was ordered by the Sheriff or someone with his designated authority.

158.   In the alternative, Harris's arrest was effected by an unknown Sheriff's Deputy John Doe without direction from the Sheriff or someone with his designated authority.

### *Count Six*: Retaliation in Violation of the First Amendment Under 42 U.S.C. § 1983 and the United States Constitution (For Injunctive Relief Against Marr in his Official Capacity Only)

159.   Harris incorporates all prior and subsequent paragraphs here.

160.   Harris filed a Complaint and application for a TRO in this Court.

161.   The same day, the Sheriff or a high-ranking official with his designated authority directed his deputies to arrest Harris in retaliation for filing this Action.

162.   The following day, the Sheriff's representative inquired into what Harris planned to do at an upcoming criminal trial. None of his questions indicated that he had any valid concern about Harris violating a criminal law of the State of Texas. Instead, the Sheriff's representative indicated that the Sheriff intended to direct his deputies to arrest Harris if she violated norms of courtroom etiquette.

163.   Harris, therefore, cannot attend criminal trials in Victoria County without fear that she will be arbitrarily arrested.

### **Prayer for Relief**

Plaintiff Anna Harris respectfully requests:

- An order enjoining Sheriff Justin Marr or any of his agents from arresting Harris pursuant to the Criminal Trespass Warning, or for merely entering any public buildings;
- An order enjoining District Attorney Constance Filley Johnson or any of her agents from taking any prosecutorial action against Harris pursuant to the Criminal Trespass Warning, or for merely entering any public buildings;
- An order enjoining Sheriff Justin Marr or any of his agents from arresting Harris without probable cause, or under circumstances where ordinary law-enforcement agents would ordinarily exercise their discretion not to arrest, in retaliation for constitutionally protected speech or for merely entering any public buildings;
- An award of nominal damages against Sheriff Justin Marr and District Attorney Constance Filley Johnson for banning Harris from a criminal trial in violation of her constitutional rights;
- An award of compensatory damages against Sheriff Justin Marr in his official or individual capacity for ordering Harris's arrest in retaliation for her constitutionally protected speech and without probable cause; or, in the alternative, an award of compensatory damages against Deputy John Doe, in his individual capacity, for ordering or effecting Harris's arrest without probable cause;
- An award of punitive damages against Sheriff Justin Marr, in his individual capacity, for ordering Harris's arrest in retaliation for her constitutionally protected speech and without probable cause; or, in the alternative, against Deputy John Doe, in his individual capacity, for ordering or effecting Harris's arrest without probable cause;
- An award of attorneys' fees, costs, and other fees pursuant to 42 U.S.C. § 1988 or other applicable statutes and rules; and
- All other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
*Attorney in Charge*
(S.D. Tex. Bar No. 2998395)
GERSTEIN HARROW LLP
611 Pennsylvania Ave SE, No. 317
Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
(S.D. Tex. Bar admission forthcoming)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Nathan Fennell*
Nathan Fennell
(S.D. Tex. Bar No. 3547280)
TEXAS FAIR DEFENSE PROJECT
314 E Highland Mall Blvd, Suite 204
Austin, TX 78752
nfennell@fairdefense.org
(512) 637-5222

*Attorneys for the Plaintiff*